**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

**THOMAS P. MCDONNELL, III**                                                    **PLAINTIFF**

**v.**                                                          **CAUSE NO. 3:12-CV-697-CWR-FKB**

**SANDY MILLER**                                                                  **DEFENDANT**

<u>**MEMORANDUM OPINION AND ORDER**</u>

Having waived their right to a trial by jury, the parties tried this action before the Court on April 2, 2014, without a jury. *See* Fed.R.Civ.P. 38(d). After carefully considering the record of this case together with the evidence adduced at trial, having observed the demeanor of the witnesses, having read and considered the proposed findings of fact and conclusions of law submitted by the parties (pretrial and post-trial), and being otherwise fully advised in the premises, for the reasons discussed below, the Court now by a preponderance of the evidence finds that a verdict shall be returned in favor of Defendant, Sandy Miller, and against the Plaintiff, Thomas McDonnell, for the following reasons:

     **I.**     **BACKGROUND**

This suit arises out of a breach of contract dispute for sale of stock. The Court has jurisdiction over this matter because McDonnell is a resident of the State of Mississippi while Miller is a resident of Florida, and the amount in controversy exceeds $75,000. *See* 28 U.S.C. § 1332. The parties are former business partners, serving as Co-CEO's and Co-Chairmen of U-Save Holdings, Inc. ("U-Save"), a corporation headquartered in Mississippi. The facts were hotly contested.

McDonnell's complaint states that Miller has not fulfilled his obligation to pay under their oral and written contract agreements. McDonnell is entitled to a judgment in the amount of $751,704.00 plus interest from October 26, 2006, he claims. The complaint alleges several causes of actions: (1) breach of contract for failure to satisfy $300,000 down payment obligation; (2) breach/default of promissory note; (3) breach of quasi-contract/unjust enrichment; (4) equitable estoppel; (5) or a constructive trust should be imposed. Miller subsequently filed a motion for partial judgment on the pleadings, Docket No. 24, in which it argued that counts 1, 3, 4, and 5 should be dismissed. McDonnell also filed a motion for partial summary judgment, Docket No. 48, as to count 2 of his complaint.

Prior to trial, the Court heard arguments on those motions. On February 13, 2014, the Court granted Miller's motion for partial judgment on the pleadings, and denied McDonnell's motion for partial summary judgment. Thus, the only claim heard at trial was Miller's alleged breach of contract claim for failure to pay the balance owed on the promissory note. This Order addresses this claim.

### A. Plaintiff's side of the story

Plaintiff claims that the current issue emanates from an agreement formed on October 26, 2006. McDonnell asserts that the parties agreed that he would sell to Miller 93,963 shares of U-Save Holdings stock at $8 per share for a total price of $751,704.00. Under the agreement, Miller promised to render a down payment of $300,000.00 on October 26, 2006. Trial Transcript of McDonnell at 106 (hereinafter "Tr."). This agreement, however, was never reduced to writing. McDonnell agreed to finance the remaining balance of $451,704.00, Ex. P-1, which required the balance to be paid on or before October 20, 2009. This agreement was memorialized in a

promissory note signed by Miller.[1] *See id.*; Docket No. 1-2. The promissory note does not mention that it is related to a stock purchase agreement and does not mention the shares Miller received. It stipulates that, if Miller breached his duty to repay his debt, he would be responsible for "court costs, reasonable attorney fees, and other reasonable collections charges" if his breach resulted in a lawsuit. *Id.* at 2.

The day after the agreement was reached, on October 27, 2006, Kendall Moore (U-Save's General Counsel) sent an email to Bob Barton (former U-Save President and Chief Operating Officer), which states, "[a]s of October 26, 2006, [Miller] purchased 93,963 shares from [McDonnell]." Exhibit P-6. The email also stated that McDonnell was owed $300,000 and payment on a promissory note for $451,704 bearing interest at 6%. *Id.*

Almost three years later, in an email dated December 29, 2009—two months after the promissory note's maturity date—McDonnell expressed to Miller that he expected payment on the promissory note as agreed.[2] Exhibit P-8; *see also* Tr. at 114. He also stated that if it was never Miller's intention to repay the loan, he "need[ed] to know." *Id.* Miller responded with an email expressing his understanding that he would not be required to pay the loan. *Id.*

Three more years past, and on March 22, 2012, McDonnell issued a detailed letter to Miller, reminding him of his obligation to repay the loan (including the rising interest). Exhibit P-9; *see also* Tr. at 115. McDonnell did not receive a response from Miller, *see* Tr. at 115, and, on June 26, 2012, he sent another letter to Miller restating the concerns in his previous letter and informed Miller that he had retained counsel. Nearly a month later, McDonnell emailed Miller

---

[1] There is no written contract of sale for the actual stock purchase agreement. At trial, it was characterized as a "hand shake deal."

[2] McDonnell stated that he had brought up the debt on the promissory note to Miller at various other times after they struck their agreement. Tr. at 111-12.

imploring him once again to pay off the debt, and offered him a one-year extension in which to do so.

**B. Defendant's side of the story**

Obviously, Defendant, provides a different version of the facts.[3] Miller alleges that circumstances leading up to the current issue provides insight into the true nature of this suit.

When Miller joined U-Save in 2003, he and McDonnell agreed to share an equal interest in the company.[4] Tr. at 223. Based on U-Save's audited financial statements, Miller paid $2.75 million for his equal shares of the company for a total of 428, 553 shares, which is reflected in a signed agreement by both parties. *See* Ex. D-7, "Subscription Agreement".

Miller alleges that because a portion of McDonnell's shares were encumbered,[5] he received around 30% of the company's shares at the time, even though his payment equaled nearly 70% of the total shareholder equity of value of U-Save. *See* Tr. at 224-5. According to Miller, McDonnell promised that he would eventually deliver Miller the stock percentage to which he was entitled. *Id.*

Miller now claims that at the time he purchased his shares from McDonnell, U-Save's financial statements misrepresented the net equity value of the company. Unbeknownst to Miller, when he purchased his shares, the company was overstated by $1.3 million.

In 2004, Robby Gathings, who, at the time, served as President and Chief Financial Officer of U-Save, informed Miller that U-Save had sold automobiles out of trust worth

---

[3] Bob Barton, U-Save's Executive Vice-President and Chief Operating Office, corroborated Miller's account of events and how McDonnell generally conducted business. *See, infra,* at 6.

[4] At the time, McDonnell owned around 80 percent of U-Save. Under the agreement, Miller was to acquire 40 percent of McDonnell's 80 percent.

[5] Miller stated that McDonnell's shares were encumbered by his cousin, Chip Tatum, and that most of the money from the sale of stock was paid out to Tatum. *See generally* Tr. at 224-5, 244.

$500,000, which depleted Miller's initial investment.[6] *See* Tr. at 229-30. The sale was not evinced in the audited financial statements presented to Miller when he purchased his initial shares.[7] In order to account for Miller's original payment, McDonnell promised that he would transfer additional shares to Miller at a later date.[8] Tr. at 243. Relying on this promise, Miller maintained his investment in U-Save.

In 2005, an audit of the company revealed that in 2003—before Miller's initial investment—U-Save's accountant made an error in identifying a 'tax asset' of $870,000, further reducing the value of the shares that Miller purchased. Tr. at 230-1. *See also* Ex. D-5, at 25 and Docket No. 53, at 3. This accounting error meant that in August 2003, when Miller purchased his shares in U-Save, the company had a reduced shareholder's equity value of $2,638,000, instead of the equity value of $3,978,000, which was represented to Miller at the time of his purchase. *See* Def.'s Proposed Findings of Fact and Conclusions of Law at 3. McDonnell assured Miller again that he would make Miller whole by transferring additional stocks at a later date. *See* Tr. at 231; *see also* Tr. at 275 (testimony of Bob Barton).

In 2006, Miller began guiding U-Save into a reverse takeover of Rent A Wreck Capital, Inc.[9][10] *See* Tr. at 232-3. The transaction resulted in the organization of Franchise Services of North American, Inc. ("FSNA"), a publicly traded parent company of U-Save. Prior to the FSNA transaction, however, the parties had formed the promissory note which is at the heart of this

---

[6] The automobiles were sold out of trust with Ford Motor Company. *See* Tr. at 98, 229. Miller is unsure whether McDonnell knew about the sales out of trust.

[7] McDonnell claims that the company borrowed the money and eventually paid their debt in full to Ford. Tr. at 99.

[8] McDonnell denies ever having this conversation. Tr. at 99-100.

[9] Rent a Wreck Capital, Inc., was a publicly traded company on the Toronto Venture Exchange. *See* Tr. at 226.

[10] At trial, McDonnell agreed that Miller worked "very hard" on this transaction. Tr. at 103.

dispute. *See* Tr. at 233. Because the reverse takeover would increase the value of U-Save stock substantially, McDonnell finally agreed to make good on his prior assurances to Miller that he would transfer additional stock.[11] *Id.* at 234-5. Bob Barton confirms Miller's allegations:

> In 2006, U-Save was preparing to . . . enter into a transaction with Rent a [W]reck Capital, Inc. . . . This provided the opportunity for McDonnell to provide more equity to Miller and to make up for the overpricing of Sandy's initial investment. McDonnell transferred 93,963 shares of U Save stock to Miller. McDonnell told me that he "made Sandy whole" with the transaction. McDonnell also told me that he "papered up" the transaction with a promissory note so that McDonnell could claim an asset on his personal financial statements, but that Miller would never be called upon to pay the amount stated on the note. I discussed this with Miller, and Miller agreed to sign this note based on the assurance that he would never be called to personally satisfy the note.

*See* Docket No. 52-2, at 3.[12] In November 2006, after the RTO was complete, each share of U-Save stock was converted to FSNA stock, which increased the value of the company's shares. *See* Ex. P-7.

According to Barton and Miller, this was not the first time that McDonnell disguised a debt as an asset by "papering up" a transaction with a loan for the purpose of inflating his personal and corporate net worth. Tr. at 235-6 (testimony of Miller); Tr. at 276-77 (Barton testimony).

In August 2007, for example, McDonnell agreed to give a $50,000 bonus to Barton for his work in taking the company public. Tr. at 236, 280. McDonnell, however, paid Barton in the form of a promissory note and obtained Barton's signature[13] by promising Barton that he would never be required to pay the loan back. Tr. at 281; *see also* Ex. D-8, "Barton Promissory Note."

---

[11] McDonnell denies that he ever made any promises to make Miller whole for anything. Tr. at 107. According to McDonnell, the promissory note represented a true debt. *Id.* at 110.

[12] The Court only cites to the affidavit because it provides a concise view of Barton's testimony. His testimony at trial was consistent with that which he presented in his affidavit. *See* Tr. at 275-76.

[13] Although the promissory note lists August 31, 2007, as the date of the agreement, Barton testified that he did not sign the document until December of 2007. Tr. at 283-4.

Later, on December 1, 2007, McDonnell signed a letter which forgave the note "in its entirety" and relieved Barton from any payment obligation. Exhibit D-9. Barton explained that he made McDonnell sign this because, unlike McDonnell and Miller, he did not have enough money to cover $50,000 in the event something went wrong. Tr. at 282-3. Despite this signed "get out of jail" agreement between McDonnell and Barton, McDonnell continued to treat the note as if it were not forgiven. *Id.* at 285-6.

Additionally, in May 2000, without consulting any other officer in the company, McDonnell issued an $80,000 interest-free note to Kendal Moore. Tr. at 277, 279 (Barton testimony); Tr. 236 (Miller testimony); *see also* Tr. 57-8 (testimony of Kendall Moore). Moore was never required to repay the note,[14] and at trial, Moore expressed no present intention to pay back the loan. Tr. at 59.

Given the foregoing facts, Miller seeks to invalidate the enforcement of the promissory note. He argues that the promissory note is invalid because it (1) is not supported by consideration, (2) there is no mutual assent, and (3) the doctrine of estoppel should prevent enforcement of the note. Def.'s Proposed Findings of Fact and Conclusions of Law at 6.

## II.   DISCUSSION

"In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52. "[T]he court's role in a bench trial [is] to make credibility determinations and, when both parties present evidence in support of their respective positions, to determine in whose favor the weight of the evidence tips." *Travelers Property Cas. Co. of Am. v. Brandenburg Indus. Serv. Co.*, 2:09-CV-200, 2011 WL 666331, at *3 (N.D. Miss. Feb. 14, 2011) (citations omitted).

---

[14] Moore testified that the loan received a five-year renewal twice. Tr. at 58.

There are two conflicting stories told by the parties. The Court is tasked with deciding which party's story is more credible. After reviewing the entire record, and evaluating the credibility of the witnesses heard at trial, the Court, in its role as fact finder, concludes that the credible evidence supports Miller's version.

The record supports Miller's assertion that he was owed additional shares. U-Save's financial statements were false at the time Miller acquired his initial shares, and Miller relied on these statements in overpaying for them. Miller and Barton both testified that McDonnell made promises to "make Miller whole." Leading up to the FSNA takeover, the opportunity arrived for McDonnell to make good on his promises. The undisputed facts show, however, that McDonnell had—to say the least—an unorthodox way of conducting business.[15] The record shows his willingness to record actual payments to other individuals as loans. The Court finds that McDonnell attempted to do the same in "making Miller whole" by disguising his payment to Miller in the form of a promissory note in order to boost returns on personal and corporate financial statements.

McDonnell claims that the promissory note was an extension of their agreement that Miller would pay for 93,963 shares. This claim seems incredible. The promissory note does not mention a contract for sale of stock. No other agreement concerning the sale of stock was put into writing. Instead of memorializing the stock transfer in a written agreement and accepting any type of payment up front, McDonnell traded 93,963 shares to Miller. McDonnell claims that Miller agreed to pay him a $300,000 down payment for the transfer of shares, yet he transferred them without ever receiving payment. Given that McDonnell had a record of conducting business by "papering" up loans and the fact that

---

[15] At trial, Barton stated that McDonnell was "flippant or loose regarding documentation and paperwork" and that he ran the company like "a family business." Tr. at 266.

Miller and Barton (two high ranking officers in the company) both testified that the promissory note was never to be paid, the Court does not accept McDonnell's version of the facts.

The Court now turns to the issue of whether the promissory note is a valid contract in accordance with the facts presented by the Defendant.

### A.  Is the Promissory Note a Valid Contract?

To determine whether the promissory note at issue is a valid agreement, this Court applies the law of contracts. Under Mississippi law,[16] "[t]he elements of a valid contract are: (1) two or more contracting parties, (2) consideration, (3) an agreement that is sufficiently definite, (4) parties with legal capacity to make a contract, (5) mutual assent, and (6) no legal prohibition precluding contract formation." *Rotenberry v. Hooker*, 864 So.2d 266, 270 (Miss. 2003) (citation and quotation marks omitted). Based on the facts alleged by Miller, the promissory note is not a valid contract and should not be enforced as a matter of law.

### 1.  Whether any consideration or mutual assent exists

Miller contends that he should not be forced to pay the balance of the promissory note because it lacks consideration and mutual assent. "Consideration is a present exchange bargained for in return for a promise." *McCallum Highlands, Ltd. v. Washington Capital Dus, Inc.*, 66 F.3d 89, 93 (5th Cir. 1995) (citation omitted). Additionally, there must be mutual assent, often referred to as a meeting of the minds of

---

[16] Because the Court proceeds in diversity, the law of the forum state, Mississippi, applies. *Capital City Ins. Co. v. Hurst*, 632 F. 3d 898, 902 (5th Cir. 2011); *Smith v. Goodyear Tire & Rubber Co.*, 495 F. 3d 224, 228 (5th Cir. 2007). State law is determined by looking to the decisions of the state's highest court. *St. Paul Fire and Marine Ins. Co. v. Convalescent Services, Inc.*, 193 F. 3d 340, 342 (5th Cir. 1999).

the parties, in which the terms of the contract are agreed upon by both parties. *Nunley v. Merrill*, 513 So.2d 582, 586 (Miss. 1987).

In evaluating the testimony and the evidence presented at trial, the Court finds that the promissory note lacks proper consideration because the note was not consummated through a bargain. The true purpose of the promissory note, as Defendant has argued, was "to manufacture an asset (a receivable) where none actually existed." Docket No. 53, at 11. In other words, the promissory note was made to conceal a debt. McDonnell transferred shares to Miller because he owed them to him. Miller never expected to be bound by the terms of the promissory note, a fact which was understood by McDonnell. It is evident that the minds of the parties never met, and the contract was never bargained for. Thus, the promissory note is unenforceable.

Because the contract is invalid, the Court need not discuss whether promissory estoppel applies.

## III.   CONCLUSION

The Court concludes that the evidence supports a finding in favor of the Defendant. The promissory note at issue is not a valid contract. Accordingly, Plaintiff's claim for breach of contract is DENIED, and Plaintiff shall take nothing from Defendant. A Final Judgment will be entered in accordance with this Order.

SO ORDERED, this the 31st day of March, 2015.

s/ Carlton W. Reeves
UNITED STATES DISTRICT JUDGE